We have one case this morning, which is No. 13-1527, WesternGeco L.L.C. v. ION Geophysical. And as our department deputy, I think, told you, we want to do the argument in the same order as the briefing. So Mr. O'Quinn would go first. Thank you, Judge Dike, and may it please the Court, John O'Quinn on behalf of WesternGeco. I'd like to start by addressing the two questions from the Court's October 19th order and then turn to some of the other issues that ION has raised since the Supreme Court's limited remand in this case. First, assuming the Supreme Court does not grant review and reverse in the IPR appeals, then Claim 23 would be the only claim that would support the entirety of the Lost Profits Award. And it does support that award, just as in Crystal Semiconductor, and just as Judge Bryson explained for this Court in Tevo v. Echostar, 516 F. 3rd 1290, upholding a Lost Profits Award even when some claims were found not infringed on appeal because all of the accused devices were found to infringe all of the remaining, were found to infringe the remaining claim in that case. ION argues that you're improperly seeking greater than full compensation because, they say at page 9, you were, quote, already obtained recovery from the third parties who actually conducted the competing surveys. Is that an accurate statement by ION? It is not, Judge Wallach. I mean, there are three different entities they could potentially be referring to. One is Fugro. Fugro was, of course, in this trial with ION originally. The surveys that involved Fugro, the devices that involved Fugro were carved out, and if ION didn't think that that was done appropriately, it could have objected at trial, and it didn't do so. With respect to an entity called Polarcus, there was a credit that was agreed to between the parties. It was a stipulated $3 million offset in an April 23, 2014 stipulation at Docket 685. And then with respect to PGS, yes, there has been a confidential settlement with PGS. I can't really speak about the terms of that in court, but suffice it to say it's certainly our position that it does not affect any of the issues in this case, and to the extent that ION disagrees, the appropriate course of action for them would be to file a Rule 60 motion in the district court. Now, I don't think they will. Mr. Burrell, who is counsel for ION now, was counsel for PGS in the IPR cases, and in the PGS case, and I think is aware of the terms of that, so I don't think we'll see such a Rule 60 motion. But do you agree that there can't be double recovery? I agree that there can't be double recovery, yes, Judge Dyke. And there's not double recovery being sought in this case. Was ION's liability somehow limited to damages for the infringing device rather than the full value of the survey? No, and that would be inconsistent with Supreme Court precedent, Judge Wallach, and indeed inconsistent with the Supreme Court's ruling in this case. I think the Supreme Court was very clear in deciding this case that the measure, of course, of damages is full compensation, and under Section 284, damages are adequate to compensate for infringement when they place the patent owner in as good a position as he would have been in if the patent had not been infringed. Let's go back to Claim 23. Yes. And the question of whether Claim 23 can support the damages award. Yes, Judge Dyke. And because there were a number of other claims which, for present purposes, we have to assume are invalid. So you rely on the testimony of Mr. Sims as saying that the infringement of each claim would support the damages award because each claim was necessary for lateral steering, and lateral steering was necessary to get the survey contracts, right? So there's that. I think that as you also walk through the Panduit factors with respect to— Well, let's just stick with that for a moment. Okay. So I've read a good deal of the record here before the trial court, and it seems to me that that statement by Sims is an assumption that he makes, and that he says that he's not a technical expert. In other words, he's not in a position to be able to tell whether Claim 23 is necessary for the performance of the survey contracts. Would you agree that that's an accurate statement of what the record shows? I don't think it was just an assumption, Judge Dyke. I think that he was reflecting things that he had learned in the record in terms of the value of the various claims of the asserted patents. Well, he was relying on Walker, right? He was relying on Walker, but I think he was also relying on, for example, ION's own documents, and this you can see at the trial transcript at 2216 and also at PTX 214. ION itself estimated in its marketing materials for this that the value of the turn mode itself, just the turn mode, was $6.4 million per year per vessel, which that calculates to be $96 to $128 million per year, which is more than the lost profits being asserted. Is that connected in the record to Claim 23? That's the problem I'm having. Oh, yes. I had my clerk look through the search of the record for references to Claim 23, and I don't see, and I may be mistaken about this, I don't see any testimony that Claim 23, the technology of Claim 23 was necessary for the survey contracts. Oh, it absolutely was, Judge Dyke, and the words to be looking for, I don't know that Claim 23 was referred to as Claim 23. It would have been referred to as line changes or as turn mode or as turn control mode. And in terms of the value of it and the necessity of it, you don't have to take my word for it. Let's look at what ION itself said about it. I'm not going to take your word for it. So I think what you need to do is tell me where in the record there is testimony by a technical expert who says that this Claim 23 technology, as opposed to the technology of the invalidated claims, is necessary to get the survey contracts. Where would I find that in the record? Sure. So let me point to a few things. First, if you look at JA8082, that is ION's own business plan. And the business plan is one of the most important. What is the site to that? JA8082. 8082. 8082. That's in 8? It's in volume 2. Volume 2. Volume 2 of the joint appendix. So this is ION's own business plan. And one of the things that ION specifically refers to as a requirement for its product, this is something that customers were expecting, was to minimize the time required to complete line changes. That is what the term control mode is all about. It is minimizing the time required for line changes. And indeed, there were certainly... But where... Maybe what you're saying is that the record talked about a particular aspect of this, which is reflected in Claim 23. That's what I understand you'd be saying. But the trouble is there isn't any... Would it be fair to say there isn't any testimony that directly says that Claim 23 technology is necessary for the surveys? So Dr. T testified... No, just try to answer my question. Is it true that there isn't any testimony in the record, specifically tying Claim 23 technology in those terms to something that's essential for the surveys? So I don't think that it's true to say that there's nothing in the record that ties it. Now, I don't think that it ties it necessarily with having, for example, the damages expert refer to Claim 23 or refer specifically to the testimony of the technical expert on Claim 23. But you had the technical expert walk through... So let me see if I can understand what you're saying. There isn't any testimony in the record specifically focusing on Claim 23 technology and saying that that's necessary. But what you're saying is that without using the... making a specific reference to Claim 23, there is material in the record showing that the technology that is covered by Claim 23 is necessary for the surveys. Is that... Yes, the technology that's covered by Claim 23, there's testimony and there's evidence in the record that the technology that is covered by Claim 23 was something that was required by customers. In other words, without it, you wouldn't have had an acceptable non-infringing alternative, which brings us back to what is the Pandewitt test? And, of course, the Pandewitt test, the question on whether or not there is demand doesn't look to the specific claim features. It looks to the product as a whole. And then the question is, are there acceptable non-infringing alternatives? And there is meticulous... But, I mean, is there this link provided in the testimony that Claim 23 is the claim that covers what? You called it the turn mode? Yes. And that the turn mode is necessary to getting the survey contracts, right? Well, it is that the claim... There is testimony that links Claim 23 to the turn mode. That is what Claim 23 covers. And then in terms of the ability to get the contracts, the question you're asking is not quite what the Pandewitt factors ask. And so I want to come back to what the Pandewitt factors ask because they are satisfied and they're satisfied with respect to Claim 23. No, but we have cases from keying on, including Ferguson and Verizon, that say that you've got to show the but-for causation here. There has to be but-for causation that but-for the ability to use the Claim 23 technology, they wouldn't have gotten the survey contracts. That's right. I mean, the question is, is one a but-for causation? But for their infringement, would we have gotten the surveys? That's absolutely right, and we prove that through the Pandewitt factors and the idea that if they weren't on the market with their product, then there would have been... We would have won those surveys. This is a two... That's exactly the problem. When you say on the market with their product, the problem is their product includes a lot of technology other than Claim 23, some of which was previously covered by your other patents. But Judge Dyke, that's going to always be true, and it's never been... That is, every product is going to be covered by things that are beyond the patented technology, and this Court has never suggested in the application of the Pandewitt test that that means that you can't recover full compensation. Indeed, quite the opposite. In Mentor Graphics, it was... Mr. Oakley, I won't interrupt you. Thank you, Judge Wallach. Why, you're welcome. You're in the fortunate position of going first, which means you get some rebuttal time afterwards. And I would be comfortable with what you're saying if you can point us to somewhere in the record where 23 is referred to as turned technology and one other place where your damages expert incorporates it in some fashion. Just draw that line for us, and I'd be comfortable with it. But you have the unique, given that we change things, opportunity to do that. No, I appreciate that. And with respect to the latter, let me answer that now, because if you look at transcript 2289, Mr. Sims, the damages expert... 2289? 2289 of the transcript. The damages expert says that acceptable alternatives, and that's what this comes down to, is acceptable alternatives. Acceptable alternatives would provide the same benefits, that means all of the same benefits, as the patented steering system. So I think that's where he links up. He's not a technical expert. He said he's not. And the testimony that you quote in your brief and rely on so heavily is based just on an assumption and by information that he has gleaned from Walker, as I understand it. So, I mean, it seems to me your damages expert is not in a position to give the technical support for the notion that the Claim 23 technology is necessary for the survey. Judge Dyke, respectfully, you keep asking the wrong question when you say necessary for the survey in the sense of the question, when you apply the Pandewitt factors, is to say whether there were acceptable non-infringing alternatives. And this Court has made clear that whether there are acceptable non-infringing alternatives is a question that depends on the specific individuals in the case, that is, people who are... I think you're giving the wrong answer. I take that from... We have to, in order to sustain this verdict, which was based on the infringement of a number of claims, some of which have now been found to be invalid, we have to be able to parse this out so that we can figure out whether the Claim 23 technology is sufficient in and of itself to support the $100 million or $90 million lost profits award. And sort of the generalized notion of Pandewitt really doesn't answer that question because we're just trying to figure out what did the jury do here? We do have a jury finding that each of these claims was infringed. The jury didn't tell us specifically whether it found that each of the claims was necessary to get the surveys, and we're trying to figure out whether the record supports a verdict that each of the claims was necessary, the claims of each of the technology was necessary to perform the surveys. And it's difficult. The briefing has not been very detailed or very clear or, in fact, all that helpful on this point. And it may be that we can't figure it out today in the oral argument, but I think we're looking for something in the record that would support the notion that Claim 23 was necessary for the surveys. Yeah, what I was saying was I want a reference to your technical expert. You know, I said both, and you tried to give me the second one, but the core is give me a reference to your technical expert and we'll look at it and make sure you give us the right one. No, no, I appreciate that, Judge Wallach, and I will endeavor to give you that today if I can, and if I can't, with the Court's leave, I'll submit a letter in which I simply refer you to specific pages from the trial transcript referencing the technical expert and where the technical expert discusses Claim 23 and tying it to the issues here. But I think that with respect to the jury verdict, of course all reasonable inferences have to be drawn in favor of the jury's verdict, and the evidence is, of course, viewed in the light most favorable to us, and to the extent that what Ion is arguing now, and that's really what it's arguing now, is that its own devices would have been an acceptable non-infringing alternative if some of the claims were found not to be infringed. Now, that was a live issue at trial, because at trial there was one claim that was already found to be infringed. They were arguing the rest were not. That was in the jury instructions, wasn't it? That one of the... If any one, yeah. Yes, no, that's exactly right, and my point is it wasn't like they were arguing that these all rise and fall together, but we addressed, as the Pandewitt factors required, we addressed whether there were any acceptable non-infringing alternatives, and you can see, for example, this is a trial transcript 2293... It doesn't necessarily have to be alternatives. It may be that the claim 23 technology simply just isn't necessary at all. It doesn't have to be an alternative. I mean, they point out to some reference, some comment that you made in connection with the IPRs, which I don't think is all that helpful, and I think we've got to decide this question based on the record that was made at the trial, not the record of the IPR. Could I shift you for a minute here to the question of apportionment? Because under the Ferguson case cited in the briefs, it would seem as though where you have technology which is reflected in a number of different patents and that if one of the patents or more than one of the patents in this case is invalid, that you have to apportion the amount that can be recovered between the technology represented by the valid patent and the technology represented by the invalid patent. That's one apportionment issue. Is that not the case? Well, Judge Dyke, first, let me... Going back to the prior line of questioning and kind of coming into this one, there's certainly been a lot that's been said by ION to try to minimize the value of claim 23 and to suggest that this was some minor feature. That is a very different tune than they were singing in the district court when they were arguing that they didn't infringe claim 23, and they argued this is their... They're entitled to do that, but we've got a different situation here now because of the invalidation of these other patents. Well, what they said, Judge Dyke, is, quote, this turn mode is one of the most important benefits of the patents, end quote. That's docket 562 at page 29. And, of course, in this court's decision in Mentor Graphics, the court is clear there can be any number of features that might be important, but as long as only one party can provide all of the features that are required by the consumers of the product, then there are no acceptable non-infringing alternatives, and that's Mentor Graphics at page 1289. And that's what you have here. There are multiple... There were multiple features that are covered by the claims. All of those features were necessary, were required, and the way that you know that is, again, partly from ION's own business plan at 8082 of the joint appendix, as well as the fact that... I'm sorry. We have the entire market value rule, and I think you yourself have referenced that as an analogy here, but so under the entire market value rule, if what is being sold has other valuable features, I mean, here, the technology represented by the invalidated patents, the provision of the bunk itself, why under that line of cases wouldn't there have to be some apportionment between the other valuable features and the features of Claim 23, even if Claim 23 were essential to the service? Sure. So, Judge Steig, I think that this is, in many ways, captured by this court's opinion, per your honor, in Warsaw v. Nuvasiv at 778 F. 3rd at 1374, and this court was clear. Lost profits and reasonable royalties measure damages differently. Lost profits are a measure of damages intended to make the party whole. A reasonable royalty is intended to compensate the patentee for the value of what was taken from him, the patented technology, and so when you start talking about apportionment, yes, you're talking about what is the value of the technology, and it makes sense to talk about that in the context of a reasonable royalty, but when you're talking about damages intended to make the party whole, the Supreme Court has been clear. That is any pecuniary loss suffered by the patent owner because of the infringement, and I think that proof of but-for causation vindicates apportionment principles, and this court said that in Reithe on Bunk 56 F. 3rd at 1548 that concern that lost profits must be related to the intrinsic value of the patent is subsumed within the but-for analysis, end quote. And I think that that principle is absolutely vindicated here, and it's vindicated by application of the Pandewitt factors, which were, of course, found to satisfy any apportionment concerns by this court in Mentor Graphics. Those factors were properly applied here, and the application of those factors means that but-for causation has been satisfied and means that the values of apportionment have been vindicated. Let me ask you one question about Delanier. If I understand it from the record that you weren't awarded a reasonable royalty on the sales to the people who conducted the surveys as to which lost profits is being sought. Am I correct about that? I'm sorry. We're a reasonable royalty as to whom? Well, the Delanier case says that you can't get both the reasonable royalty and the lost profits. Once you pay a reasonable royalty, you're essentially licensed to do the thing. As I understand the record, and correct me if I'm wrong, your position is that there was no award of reasonable royalty with respect to the sales for the surveys as to which lost profits is being claimed. Yeah, there was no award of reasonable royalties for devices as to which lost profits are claimed. That is our position. The jury was specifically instructed, this is a JA11087, that Western Geco may require either lost profits or reasonable royalty but not both. Mr. Sims explained that the damages were separate for separate acts. This was an issue, whether there was a double counting here or an attempt at double recovery was an issue that ION raised at J-Mall. The district court specifically considered that argument and rejected it. That's a JA35, and they did not appeal. So it is our position that with respect to lost profits, we were not compensated for those by the reasonable royalty, and so we're not in the situation presented in Glen Eyre. Let me ask if there are questions with respect to the reasonable royalty award, which is itself the subject here of a separate final judgment which has been executed. Indeed, the reasonable royalty amount was paid two years ago. There have been suggestions in the briefing that that can be reopened at this stage. We respectfully submit that it cannot. ION, of course, agreed to entry of a final judgment, and it received benefits in conjunction with that. That part of the case is completely final, pursuant to this court's original mandate back in 2016. Okay, well, let's hear what they have to say about that, and you'll be able to address that again in reply. Unless my colleagues have any further questions, we'll give you three minutes for rebuttal. Thank you, Judge Stein. Good morning, Your Honors. May it please the Court, David Burrell for ION Geophysical. If I may start with some of the questions that the Court was asking. Why don't we start with the last question, which is fresh in our mind. Having paid the judgment reflected by the reasonable royalty, how is it possible that you can get that back? A final judgment for purposes of this Court's decision in Firsinius is a final judgment that entirely concludes the litigation. This Court was clear about that and relied on the Supreme Court's decision in Simmons v. Greer. Yeah, but Moffitt also says if you've been paid, you can't get the money back, right? I mean, what case says that having paid a judgment that you can get the money back? Respectfully, I don't think Moffitt quite says that. Moffitt was addressing a surrender issue where the patent wasn't void ab initio as opposed to a cancellation, which is what you had in the Simmons case and what you have here. What case says you can get the money back once you've paid it? Well, I think United States v. Morgan suggests that you can get the money back if it was pursuant to a court order,  addresses that standard from the Supreme Court in United States v. Morgan. We attempted to do so. And, Your Honor, the reality here is that we have intervening controlling authority, as this Court put it, in the context of its prior case law. We wouldn't be here asking for the money back, obviously, if the claims hadn't been invalidated. But the law is clear that there was no final judgment in the sense of a final judgment adjudicating entirely on the merits, as Simmons v. Greer from the Supreme Court says. And so that judgment is not final. So you lose it. A party loses a case. They pay the judgment. Sometime later, the law changes. They can come in? Absolutely not. Absolutely not. Because that is a final judgment that conclusively and finally decides the case. The litigation is entirely concluded, as this Court put it in Fresenius, and the Supreme Court put it in Simmons v. Greer. That has not happened here. I'd submit that Simmons v. Greer is a much harder case than this one. In that case, there were two claims. There was a patent claim, and then there was an unfair competition claim. And in that case, the patent claim had been finally adjudicated, pursuant to an appellate decision, and was concluded on the merits. But there remained, unadjudicated, the unfair competition claim. But judgment hadn't been paid in that case, right? But respectfully, I don't think the question in Simmons v. Greer or its progeny is whether the judgment had been paid. The question is whether there's a final judgment that conclusively and finally adjudicates all claims on the merits. And here, that's missing. The fact that we paid the judgment, rather than, for example, posting a bond on appeal, which, had the judgment been vacated, we would have received back, is really of no moment. That's just a question of whom we pay. We paid pursuant to a court order, which the Supreme Court explained in United States v. Morgan, and then the Qualcomm case further addresses, is sufficient to ask for restitution. It's not as if we paid out of charity or out of our goodwill. It was pursuant to a court order requiring the sureties to pay. And the law is clear, whether Westman Gico thinks it's fair or unfair, that we're entitled to litigate at this stage anything that is in the case, because the case is not open. But you set it up yourself so that you would pay the judgment. It wasn't as though the court said, I'm not going to delay payment of this judgment. You stipulated to a final judgment and agreed to pay, right? After the court ordered that the sureties have to pay the judgment. So it was under the Qualcomm case, which analyzes Morgan and its progeny, the question is whether the payment was pursuant to a court order or as a result of a court order. And this clearly meets that test. The sureties were required to pay the... Where is the order requiring the sureties to pay? I believe that is... Were they required to pay it immediately or at the close of the case? There was not a suggestion that they could pay it later. Did you ask for it to be paid later? I'm just confused as to why you paid when you knew these IPRs were going on. If they were successful, that might result in a reappraisal of the reasonable royalty rate. Well, we tried not to pay it and we advanced that argument to the district court that we shouldn't have to pay it and that it should be delayed. And the court ordered that the sureties have to pay the award. But you didn't appeal from that decision. I mean, you could have appealed and said it was improper to make us pay because of the ongoing IPR proceedings, but you didn't. You actually paid and you stipulated to no appeal. Well, we stipulated... I think Western Geco mischaracterizes that stipulation. We did not stipulate to no appeal of reasonable royalty, just enhancement of damages. Sure, but you didn't appeal. We did not, but again, neither did the parties in Fresenius appeal the infringement determination. Fresenius is a little bit different, though. I find it odd that there was anything going on at the district court at all once cert was granted in this case. I mean, it seems curious to me that you even agreed to or didn't try to get it stayed while cert was ongoing in the case because we sent that back. That part of the case that we sent back hasn't come back to us. But you're arguing parts of that even though you didn't appeal it. Right, and again, as in Simmons v. Greer, there's no requirement that the issue remains appeal or live or even unpaid. That's not the distinction. The question is, is the case a final decree in the words of Simmons v. Greer, and a final decree is one that finally adjudicates the entire case on the merits, and that's missing here. Where's the order that the shorty sent back? I believe the district court docket number is 725. I will check that. It's 725 and 750. Is it in the joint appendix? I do not believe that is in the joint appendix. Before the district court, you made a double-counting argument and an apportionment argument in relation to royalties. Yes. Did you make that argument in the context of lost profits before the district court? It was an argument that the reasonable royalties cannot be awarded on Digifin devices that were used in lost-profit surveys, so it was the same argument that those cannot be double-counted. And Western Geco suggests that the jury didn't do that because the jury wasn't instructed to do that, but what the record reflects here is that there was no identification for the jury of which Digifins were used in the lost-profit surveys, so that the jury was not able to say, well, here were the devices used in the lost-profit surveys, here were the devices used in the non-lost-profit surveys, we'll award reasonable royalties for one set and lost profits for the other and thereby ensure that there's no double-counting, as Glenn Eyre would require. It was impossible for the jury to do that. It would have been impossible for them to do it, according to you, but in fact they were instructed to do that, right? They were told that they couldn't award lost profits for the surveys as to... I mean, they couldn't award reasonable royalties for the surveys as to which lost profits. That's true, they were told that, but they certainly weren't equipped to do it and they couldn't possibly have done it. They could have been told to solve cold fusion while they were at it, too. That doesn't mean they were equipped to do it. There's no evidence in the record about which Digifins were used in the lost-profit survey, which would be a requirement not to double-count. What Western Geco relies on is that the jury gave Western Geco less money in the reasonable royalty than they asked for, and they say, well, this may have reflected their effort to avoid double-counting. Maybe, but certainly not in any accurate way because the jury, again, didn't have the evidence it would have required in order to do it. The district court disagreed with you. The district court said they were told to not double-count. They clearly worded to avoid double-counting and that ION did not object to the jury instructions at trial. Indeed, they were told not to double-count. That doesn't mean that they, in fact, didn't double-count. There was no evidence that they could have used to stop from double-counting. That's the simple point. Did you raise this double-counting argument on your first appeal? We raised the unavailability of damages as a whole and lost profits as a whole, but with particularity, no. Right, this argument would have been available to you on your first appeal. As a subsidiary argument, that is, in fact, true. And you didn't make it. We did not directly make this argument. We did note that if any of the infringement or other determinations were changed, that a remand would be necessary to redetermine damages. But you're right, Judge, with respect to this particular question, this was not specific. I don't understand. Here's the instruction. If you find that Western GECO has established infringement, Western GECO is entitled to at least a reasonable royalty compensated for that infringement. If you find that Western GECO has not proved its claim for lost profits or has proved its claim for lost profits for only a portion of the infringing sales, then you must award Western GECO a reasonable royalty for all infringing sales for which it has not been awarded lost profits damages. You didn't object to that, and it seems pretty clear to me. There's nothing wrong with the instruction. There's nothing to object to. That's right. They shouldn't have double-counting, and they're instructive. Did you argue to the jury that it didn't have enough information to follow that instruction? We argued that to the court in our JAMAL motion. I didn't ask you that question, did I? We argued double-counting. We did argue double-counting to the jury as well. Right. You gave the jury information that it should avoid double-counting. Is that correct? That's true, and the jury was instructed. Went off willy-nilly and disregarded you. Presumably, but that certainly doesn't mean that there was evidence in the record that would support its doing so. And the question here where I think we clearly have a need to remand this case for a redetermination of damages given the invalidation of all of Western GECO's broad lateral steering claims is whether the district court should get it right this time. And if we're actually to avoid double-counting, as Glen Eyre and the law requires, it should be required that Western GECO identify the digifins that were used in the lost profits award and ensure that they don't recover reasonable royalties for those same digifins again. That's simply what the law requires. Don't your own records reflect the necessity of the utilization covered by Claim 23? No, they don't at all. So let me parse this because it's very, very important. Yes, it is. And so my colleague talked about turn control mode and line changes as if that's synonymous with Claim 23 and so that he can sort of... Could you do it without Claim 23? You could absolutely do it without Claim 23. The entire basis of Western GECO's lost profits claim, and you can see this from the portion of the testimony they cite in their brief on page 14, is that without the patented technology, lateral steering cannot be used by IONS customers and lateral steering was required for the surveys. Those broad claims to lateral steering are gone. Those are like Claim 15 of the 967, Claim 18 of the 520. Those are all gone. What's left is a narrow claim. It's the runt of their patent litter, and all it claims is one particular way of doing turn control mode. It's not synonymous with turn control. If you look at Claim 23, it requires a particular series of steps as to how you steer during a turn to throw out streamers in one direction, to throw them back and steer them in another direction, and not just do that, but do them in a way so that it returns to something called feather angle mode. That is one and only one way... Which of the other claims that were invalidated talk about the turn control mode? Well, Claim 18 talks about doing either turn control mode, which is, again, not even done during data collection, feather angle mode, which is done during data collection and is really the key mode for streamer steering during a survey. Claim 18 talks about the turn control? Yeah, so it's a much broader claim where you can do turn control... Let's look at Claim 18. Sure. This is one of the invalidated claims. It is. So this is on 536, right? Yes. And what you see in Claim 18 is that it's a broad claim that covers using turn control mode, feather angle mode, or streamer separation mode. Streamer separation mode is also very important because that is what prevents the streamers from getting tangled with each other, which is a disaster if that happens during a survey such as when you have bad weather. So that's the broad claim. And what the PTAB found, again, obviously, since affirmed by this court, is that streamer separation mode is, in the prior art, invalid. And the key mode, this feather angle mode, which is what you use when you're actually collecting data in a survey, and that's what these companies really wanted, which is accurate data collection. That's what these surveys are all about. That's invalid, too. And so the jury operated in a world where one could not do streamer steering without practicing Western Geco's claims. No one. No one said that you had to do that. I think Your Honor was asking the right question, respectfully. And the answer to the question of whether there's any evidence in the record that Claim 23 was necessary in the award of these surveys is that there is no such evidence tying Claim 23. And there has to be under this court's case law in Mentor Graphics and going all the way back. The non-incringing alternative analysis has to be done on a patent claim by patent claim basis and a customer by customer basis. So with respect to each of these surveys, they would have to show that the customer would not have bought the survey but for the technology of Claim 23, and that they wouldn't have bought a survey either without any turn control at all or with a different turn control mode that doesn't infringe Claim 23. That evidence is absolutely lacking in the record, and it forecloses any award of lost profits in this case. And, you know, you can ask them to come up with evidence. There is none. They can try to put together turn control mode or line changes and the importance of that with the surveys, but again, Claim 23 does not cover all turn control modes. It claims one particular feature, and that's why we cited the IPR evidence, which is evidence from Western GECO saying, listen, the reason our patent survives and the PTAB should not even institute trial here is that the prior art recognized turn control problems, problems during turns, and provided one turn control mode that's different than ours. I think we've got to look at the record that was made before the district court in addressing this question of but-for causation and not the record of the IPR. And I agree, Your Honor, but the question is who bears the burden, and obviously Western GECO bears the burden of showing this causation, and whether there's any evidence in the district court record of the sort that you are requiring, connecting not turn control mode generally, not line changes generally, but specifically the features of Claim 23 to the award of each of the lost... The question... No, you're wrong. You're wrong. The question is, is there sufficient evidence in the record for the jury to make that determination? That's the question. And the answer to that question... Do you agree with that? ...is absolutely there's not, and what Verizon... Do you agree with that? Well, I think it's actually a little different under Verizon. I think the question that you have to ask... This is not a normal sufficiency standard given the invalidation of all the broad claims. The question is, what did the jury conclude? Can we determine why the jury awarded the damages it did and whether those damages were attributable to the sole claim that remains? And that's why the normal rule in those cases is to send the cases back. That's the normal rule. And the only two cases that are not sent back that Western GECO cites in its brief, the Crystal Semiconductor case and the Beckton-Dickinson case, both of those cases involved situations where both parties agreed that it shouldn't be sent back and didn't ask for a remand, which obviously we're here asking for a remand. So the normal rule here is to say, listen, if we have a general verdict like we have here, we look and try to figure out what did the jury do, and generally you can't figure that out because the jury was operating under an assumption that ION's customers could not do lateral steering full stop. That assumption is now gone. The lateral steering claims are void ab initio, and so as a normal rule, we send it back unless there's some particular reason not to, and there certainly is no such reason here. The jury can take your client's word that turn control was vital. Well, again, it has to be done on a customer-by-customer basis. I think the... Wait, wait, wait. I thought your point here was that turn control is covered by other claims, for example, Claim 18, and that Claim 23 is only one aspect of turn control, one subset of it. One way of doing turn control mode. Yes. That's right. And so they would have to... I mean, the document that was cited, respectfully, doesn't say anything like that. It just talks about line changes as a feature. So I don't think any such evidence is in the record. The jury would have to find... Again, as Metro Graphics said, as Judge Dyke was asking before... I seem to recall seeing it. There was discussion. Not of the turn control mode of Claim 23. No, no, no, no. But there was discussion, internal discussion, from your company about sales. That's what I'm remembering seeing. That's right, but again, the jury would have to find that Claim 23 was the basis for the sales on a customer-by-customer basis, and those sales would not have been made absent the features of Claim 23. The customers would not have accepted either something that didn't practice Claim 23 because it didn't have turn control at all or a different kind of turn control, a non-infringing alternative. Absent that showing, there's no lost profits. That's, from grain processing on forward, the black-letter law. And so that's what Western Geco would have to show. They certainly didn't show that below. There's no evidence in the record tying Claim 23 to the decision by these customers to buy these surveys from ION's customers. And so Western Geco basically is at a place where they have no evidence in the record to support the jury verdict on Claim 23, which wasn't even the basis, of course, for the jury's determination, given that the jury rendered a verdict under the assumption that lateral steering was not possible, exactly what Western Geco's experts told them in the then-existing world where Western Geco's other claims were valid, which is, of course, what the jury thought. Can we turn to the apportionment question, unless you have another question? Turn to the apportionment question. Let's assume that there are, hypothetically, that there is but four causation. Does there have to be apportionment among the various features of the technology, since some of the claims have been invalid, and apportionment of the profits attributable to the solution of the vote? And that's point one. Point two is, did you argue this? Well, let's talk about point one first, and then we'll get to point two. The answer to point one first is, absolutely, there has to be apportionment. The Supreme Court has made clear for 150 years that the patentee, in the name of full compensation, which is what the Supreme Court said, again, in this Western Geco case this year, must, in all cases, separate or apportion between the patented feature and the other features of the product. That was the Garrison v. Clark case in 1884. And the later cases, like Dobson and Blake v. Ferguson and Seymour, they all say the same thing, that you have to conduct an apportionment analysis that it is overcompensating a patentee if you give him more than the value of the patented feature, because they're not allowed to profit from the now-invalidated features, let alone the features that they never patented that were relevant to the surveys, including, for example, the vessel itself, the data analysis from the survey, the streamers themselves. These devices are one small component of enormous surveys, and given what remains of the patent portfolio, the detritus of Claim 23, the notion that that should somehow support an award of lost profits for the entire survey is contrary to more than a century of Supreme Court case law. Roberts. Did you raise the issue? Well, we raised the issue that lost profits were per se unavailable because of the direct competition requirement. We raised that issue before the Court. That issue remains, and the apportionment that you raised, the argument that apportionment is necessary. Well, I mean, the apportionment issue is not created by the invalidation of these other claims, because as you mentioned, there are other features that go into the survey, the provision of the boat, the provision of the streamers, and so the apportionment argument exists even before the invalidation of the other claims. It's quite different now, given that lateral steering is off the table. But I grant you that, but I would submit that in arguing that lost profits are unavailable because of the absence of direct competition here, that says lost profits are completely off the table, and the direct competition is relevant to the apportionment analysis as well in this Court's decision in Mentor Graphics, where the Court basically tries to address the question of whether apportionment is required and creates an exception into which this case does not fit and says that there can be, in such cases, only one award of lost profits because you have two companies, there, Mentor Graphics and Synopsys, competing for the same sales, and a party shows, the patentee shows, that but for the infringement, it would have made that sale. So in that particular case, Mentor Graphics says you have this direct competition, and so apportionment is not required. We submit that that standard is not met here. ION does not directly compete for the same customers with Western Geco. Therefore, lost profits are completely off the table, and as a subsidiary point to that, absent direct competition, there can be no excuse to avoid the 150 years of consistent Supreme Court precedent requiring apportionment between patented and non-patented features, and this case screams out for that. Explain to me how you deal with your expert's testimony that he based his damages model on infringement on, quote, at least one valid claim. I'm glad you asked me that because I think that's a perfect example where the record is being overread. If you look at that testimony... Well, he said it, and I looked at it. Well, indeed, and so if you look at that, it's DKT 507 at 4656. What he says is... I see it at 27. And what he says precisely is that lost profits are unavailable for several reasons. So he articulated the view to the jury, and let's be clear, the jury completely rejected what he said, so it certainly wasn't the basis for anything the jury did. But what he says was lost profits were zero whether you had five Biddleston claims valid or infringed, zero Biddleston claims valid and infringed, or one Biddleston claim valid and infringed. Zero all the time. The notion that that's somehow an admission, that a lost profits award of $93 million is appropriate when one narrow claim is valid and infringed, respectfully, is mind-boggling. He admitted no such thing. He simply admitted that his model... He said his model assumed at least one valid claim. That's right. What was his model? Well, his model was how much would Western Geco have lost with the infringement. And so he was attacking various aspects of the SIMS model and SIMS analysis, which said, here's my analysis, and you can't do streamer steering  And so he basically said these ten surveys all required streamer steering, so Western Geco gets lost profits for them. And so our expert assumed, as every single damages expert in every lost profits case around the country does every day, that one claim is valid and infringed, at least one. Because otherwise, you, of course, have no lost profits and you have no damages. So every one of these non-technical experts says, that's the assumption I'm making.  or any of the technical analysis. I'm just making that assumption. And what he says is, lost profits under any scenario are zero. Zilch. He never suggested that lost profits should be $93 million if only claim 23 of the 520 patent is upheld. And nor did Mr. SIMS, Western Geco's expert. He just, of course, assumed that all the claims survived. Sorry, all the patents survived. Because each one would prevent ION's customers from using lateral steering. Not that one claim survives. And Western Geco sort of changes the phraseology between its first brief where it actually quotes the testimony and its reply. Yeah, I know. Okay, all right. Thank you, Mr. O'Quinn. Thank you very much. Mr. Burrell, you have three minutes here. Thank you, Judge Dyke. Again, John O'Quinn on behalf of Western Geco. Let me start with... the question of whether it's possible if a district court orders a judgment to be paid, orders the securities to pay the judgment, that there's a possibility of recovering it. Is that correct? Yeah, so Morgan deals with a question of restitution. And restitution, of course, is ultimately an equitable... A separate lawsuit, or what? Well, it was, yes, the idea that you could then go back and use... What happened in Morgan? I haven't read the case. I don't recall the specifics of what happened in Morgan, Judge Dyke. But my understanding is that what the court said was that potentially you could have a claim for restitution, restitution being an equitable doctrine. And here, of course, you have a situation where Ion agreed to the entry of final judgment for that part of the case. They say it was done under compulsion because the district court had ordered the securities to satisfy the judgment. Tell us what happened. Yeah, that's... There are a number of different things that happened, and Mr. Burrell is kind of mushing them all together. This court rendered a final decision that remanded nothing to the district court in 2015. In 2016, following the Supreme Court's GVR, this court remanded the issue only with respect to enhancement. This court never remanded, and to this day, has never remanded the issue of reasonable royalty, which, as we talked about before, there's no double counting. That goes to different, distinct acts of patent infringement. Sorry, no, no, no. They're related only in the sense that under Hazelquist and Aspic's eyewear, those are, of course, distinct acts of patent infringement. So the only thing that the district court had before it ever on remand was the issue of what it sought to execute following this court's precedent in King v. Otari, which made clear that this court can render a decision that renders part of the case final while part of the case is still open. We sought to execute on the reasonable royalty because there was nothing to be done vis-a-vis reasonable royalty. That part of the case was over, finished, final, and could never be appealed back to this court. And the district court ultimately granted execution. Now, at the same time, you had the remand from this court with respect to the enhancement. So they say that they agreed to the payment of the satisfaction of that part of the judgment under compulsion from the district court. Is that correct? Well, only in the sense that there was nothing else left to be done. Compulsion in the sense that you could collect Right, exactly, correct. There was nothing else left to be done in terms of execution. This court had affirmed with respect to the reasonable royalty. Sure, but that's the same thing that happened in Fresenius too. But it's not, Judge Hughes. But, I mean, the difference here is they paid. I think there are two fundamental differences. Yes, there is the difference that they paid. But second, in Fresenius, this court actually had issued a general remand. Indeed, that's how this court distinguished the D.C. Circuit's decision in Qualcomm. This court had issued a general remand, and on remand there was a motion for a new trial. Some of the claims had been found to be either infringed or not invalid, and some of the claims had not. And the court below in Fresenius denied execution. And it denied execution saying even though it was denying the motion for a new trial, that it was appropriate to seek a new trial because of the remand. This court's remand, this court's decision both in 2015 and in 2016 remanded nothing with respect to the reasonable royalty. 2015 remanded nothing at all. In 2016 only the issue of enhancement. That then brings us to Docket Entries 769 and 770 which is the entry of final judgment with respect to the issues that remain in front of the district court. And that's where you actually had an issue litigated in front of the district court on enhancement. And the parties then did agree and not just to not appeal enhancement, but agreed to the entry of a final judgment from which no appeal was taken. And I think that is absolutely dispositive with respect to all of the issues which this court had affirmed or had remanded because no appeal was taken as to the remand. And that makes this fundamentally different from Fresenius where things had been remanded that were then back in front of this court and from E-Plus where things had been remanded and then were back in front of this court because there the issue was that the injunction wasn't final. With reasonable royalty and underlying acts of patent infringement it absolutely was final. And it would be one way you could think about what the district court ultimately did here, of course is consistent with the Fifth Circuit line of cases that you can sever parts of cases. That's United States v. O'Neill 709 F. 2nd. 361. And in entering a final judgment with the things that the district court had before it Was there a 54B judgment entered here? Well, Judge Dyke, there wasn't a 54B judgment and I don't know how the district court... Certification. Was there a 54B certification? Yeah. And I don't know how there would have been because the district court was resolving literally everything that it had in front of it at the time when it entered into the final judgment, which again, ION agreed to. And ION got benefits from that. We agreed... Where is the final judgment that was entered with their agreement? Where in the record? 769 is the... Page 769. No, no. It's a docket entry.  because this postdates the Joint motion for entry of judgment and includes the party's agreement as an attachment. And what you will see is that agreement specifically... I know you're excited, Mr. O'Quinn, but... Are you going to tell us... Are you going to tell us where in the record we can find claim 23? So, if I may, Judge Wallach, let me just finish this one thought and then I'll turn to that and then I want to come back to the issue of apportionment. So 769 and then 770 is the entry of the judgment. And to be clear, they entered that weeks before argument was scheduled to be had in this court in the IPR appeal. So it wasn't like the IPRs came out of nowhere and surprised them. They entered knowing full well about that with no reservation of rights whatsoever. And it wasn't raised. And it was not raised. And that's actually... The same is true on apportionment. And I will... I promise I'll come to the question on the record. But vis-a-vis apportionment, they never asked, for example, for their expert or for any of their witnesses to address apportionment at trial. And they did not appeal apportionment to this court. You can look through their original briefs in this case. You won't find the word apportionment. It is not in there. They didn't raise it. And the Supreme Court's limited remand on the issue that remained in the case does not open up the argument for them to be able to address apportionment at this point in time. Now, coming back, Judge Wallach, let me share what I have and then I'll tell you what I don't have. What I don't have with me is the entirety of our technical expert's testimony. Is that Walker? It's Dr. Trefilio. He's your infringement expert? He's the infringement expert. He is a technical expert, addresses infringement. But he doesn't address the surveys, right? The necessity for the technology for the surveys. That's Walker, right? It's Walker, I believe, who talks about the surveys. And I don't have the entirety of the transcript of him with me. And with the court's permission, I'll submit a very straightforward, non-argumentative letter on Monday that just cites what we think are the best transcript sites that we have from the record in which they reference Claim 23. What I can provide you today are a couple of things. First, the inventor, Biddleston, does discuss the benefits of his invention, and he is discussing the benefits of Turn Control Mode at JA 1531. Yeah, but what they're saying, and I think this is what you need to respond to, is that the Turn Control Mode is Claim 18, which is validated, and that Claim 23 is not the entirety of the Turn Control Mode but just one limited aspect of it. That is entirely false, Judge Dyke. Claim 18 doesn't claim some broader Turn Control Mode. What Claim It does refer to Turn Control, doesn't it? It does, but what it is referring to is then what is claimed in Claim 23. Claim 18 talks about a system that has one or more of the following features. Then Claim 19, which was Feather Angle Mode, is describing one of those and specifically claiming one of those features in the same way Claim 23 is then claiming the Turn Control Mode feature. The question ultimately, of course, doesn't have to be, and I think Mentor Graphics is expressly clear about this, it doesn't have to be that that was the sole basis for the sale. The question has to be would we have made the sale but for the infringement? And you have the witnesses going through and addressing what were the alleged non-infringing alternatives and whether or not they were acceptable. And they weren't. And that's, for example, Trial Transcript 2293, 2290, 1073 to 75, and indeed ION itself identified no alternatives to Western GeoSystem. I'm not sure that that's the question. The question is whether this additional feature was necessary to perform the service. To be sure if there were an alternative, that would be relevant. But I don't think that the absence of an alternative to that is necessarily dispositive because you might not need the feature at all. Well, Judge Dyke, the turn, of course, the turn mode... 18 is the apparatus. 23 is how you use it. No, 23 is an apparatus claim too. It covers a system that is configured to use the specified turn control mode. So it runs to the entire apparatus. The claim is to the entirety of the apparatus. And while Mr. Burrell colorfully described it as being the runt of the litter, I would refer you to doc at 562 at page 29. This turn control mode, I mean, I understand they're the latest counsel, but they said this turn mode is one of the most important benefits of the patent. And the turn mode was discussed at trial again, Biddleston at 1531-32. There's a fact witness... Whether that turn control mode is Claim 18 or whether it's Claim 23. Well, Judge Dyke, there's no suggestion that it's Claim 18. I mean, again, when you look at how... I've heard it suggested it was. I don't understand that purported reading of the patent because the way the patent is written, Claim 18 is an apparatus comprising an array of streamers, and then it goes on to say a control system configured to use a control mode. Selected from a feather angle mode, a turn control mode, a streamer separation mode, and two or more of these modes. And then Claim 23 goes on to explain what the turn control mode was. And the court at claim construction defined control. I think we're about out of time. Well, if I may make two final points with your indulgence, Your Honor. One is that the court at claim construction construed one turn control mode, not different ones for different claims. And two, in terms of some additional testimony that I can point you to that is in the Joint Appendix, I would point you to JA-1282 and JA-2615, both of which are examples of the turn control mode was, which is to get this turned around more quickly. The question is never can you turn a system around. Thank you, Judge Degg. Thank you, Mr. O'Quinn. Thank you, Mr. Bernal. Thank you, Your Honor.